**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **FOREST RIVER FARMS, on behalf of itself and others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Case No.** |
| **v.** | ) ) | **Jury Trial Demanded** |
| **MONSANTO COMPANY,** | ) ) ) | |
| **Defendant.** | ) | |

**CLASS ACTION COMPLAINT**

**BACKGROUND**

Genetically-modified ("GM") crops and food are often touted to farmers and the public as miracle products. But when patented GM technology so changes the economics of agriculture that farmers have no choice but to use it, thus allowing biotech companies to charge monopoly prices and unfairly control the market, it is illegal conduct.

Here, Monsanto, one of the largest of a limited number of massive multinational crop protection and seeds manufacturers, irresponsibly commercialized its Roundup Ready 2 Xtend cotton and soybean seeds. Monsanto knew full well that commercializing dicamba-resistant technology would cause a spike in the use of dicamba, a dangerous and toxic herbicide, because the exclusive feature of its patented Roundup Ready 2 Xtend seeds is the seeds' resistance to dicamba. Monsanto conspired, agreed, and combined with other major biotech firms, including at least Dupont-Pioneer and BASF, to

unlawfully dominate the soy and cotton seed market. Monsanto and its co-conspirators' commercialization of dicamba-resistant seeds has created a distorted and monopolized market, a market manipulated by and susceptible to Monsanto's domination. Soy and cotton producers lack competitive alternatives to Monsanto's dicamba-resistant technology because they must buy dicamba-resistant seeds or risk massive crop losses.

In commercializing its dicamba-resistant traits, Monsanto is capitalizing on a problem it created by irresponsibly commercializing its dicamba-based crop system. In short, Monsanto released the proverbial genie in a bottle, knowing it could charge monopoly prices for putting the genie back in the bottle. In so doing, Monsanto created a vicious cyclical market driven by a set of perverse incentives: farmers must buy dicamba-resistant crop seeds to defend against dicamba volatility and drift; the purchase and planting of dicamba-resistant seeds leads to spraying more dicamba; and spraying more dicamba leads to the purchase of more dicamba-resistant seeds. The wheel keeps turning, and Monsanto and its cooperating competitors continue to profit at the expense of producers, and in fact profit on the very acrimony created by their dicamba crop system.

Monsanto engaged and continues to engage in a conspiracy, contract, or combination to monopolize the market for soy and cotton seeds through the commercialization and licensing of dicamba-resistant seeds. Monsanto has monopolized and/or attempted to monopolize the soy and cotton seed market. Monsanto's actions constitute unreasonable restraints of trade under the Sherman Act.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1337 (actions arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies).

2. Venue in this district is proper under 28 U.S.C. § 1391(b) because Monsanto resides in this district and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

3. This Court has personal jurisdiction over Monsanto under 15 U.S.C. § 22 because it inhabits, may be found and/or transacts business in this district. Among other things, Monsanto and/or its agents sold dicamba-resistant technology to class members in this district. Monsanto conducts business in this district, has exercised its monopoly market power in this district, and has sold its products in this district, including sales of its dicamba seeds and crop-protection products to producers such as Plaintiff. Monsanto is also headquartered in this district and has its principal place of business in this district.

## PARTIES

### Plaintiff

4. Plaintiff Forest River Farms Partnership farms in Forest River, North Dakota. Plaintiff purchased and planted dicamba-resistant soybean seeds in 2017 from Monsanto. Plaintiff did not spray his own crop with dicamba, but rather bought dicamba-resistant seeds due to concern regarding dicamba drift and volatility from neighboring farms.

*Defendant*

5. Monsanto is a Delaware corporation and is one of the largest multi-national corporations in the world. Monsanto is headquartered in St. Louis, Missouri. According to its website, Monsanto employs over 20,000 people worldwide and has facilities in 69 countries. *See* https://monsanto.com/company/. Monsanto develops, markets, and sells crop protection and biotechnology products, including GM crop seeds. Of special significance in this case, Monsanto's dicamba-based system includes GM seeds such as its recently-commercialized Roundup Ready 2 Xtend Soybean ("Xtend soybeans"), Bollgard II XtendFlex cotton ("XtendFlex cotton"), along with a dicamba-herbicide known as XtendiMax with VaporGrip Technology.

## FACTUAL ALLEGATIONS

### I. Monsanto Commercialized Its Dicamba-Resistant Cotton and Soy Seeds Before Approval of Its Next-Generation Dicamba

6. "Dicamba" refers to a highly volatile form of herbicide used to kill pigweed, a weed that can damage crops such as soy and cotton.

7. "Dicamba-resistant seeds" refers to genetically modified seeds manufactured, commercialized, and sold by biotech companies such as Monsanto that produce plants that are resistant to dicamba.

8. "Commercialization" of a GM product is typically defined within the biotech company as the first planting of a new GM seed when the new GM crops are intended for resale, thus excluding test plots planted to comply with EPA requirements.

4

9. Dicamba was not historically marketed by Monsanto, but has been manufactured and marketed by several other companies since the late 1960's. Dicamba was not used often before the commercialization of Roundup Ready 2 Xtend seeds because of its negative notoriety among farmers for drifting to surrounding farms. Dicamba is toxic to plants that are not genetically engineered to withstand it, including neighboring crops. Historically, dicamba was used before planting as a pre-season option, or after harvest during the "burndown" period. If used at these times, dicamba – while still potentially dangerous – is less prone to drift than if used during planting. *See* Danny Hakim, Monsanto's Weed Killer, Dicamba, Divides Farmers, (Sept. 21, 2017) N.Y. Times https://www.nytimes.com/2017/09/21/business/monsanto-dicamba-weed.

10. Monsanto's first generation of herbicide and GM crops used the banner trade name "Roundup" and "Roundup Ready." First-generation Roundup used a chemical called glyphosate to kill pigweed. Over time, however, the targeted weeds developed herbicide-resistance, becoming known in the farming community as "superweeds." These superweeds developed because of the man-made evolutionary resistance developed over time to glyphosate but – at least according to the biotech firms developing next-generation dicamba and dicamba-resistant seeds – dicamba could still kill the superweeds.  *See*  https://www.npr.org/sections/money/2017/06/02/531272125/episode-775-the-pigweed-killer.

11. Recognizing the opportunity to monopolize the market with a new trait to address a weed problem that its first-generation Roundup Ready products produced, Monsanto, with the aid of BASF, set out to develop a crop system featuring dicamba, an exceptionally volatile and damaging herbicide.

12. BASF is one of the world's leading chemical companies and original inventor of dicamba. It historically has competed with Monsanto in at least crop protection products.

13.  Monsanto began development of seeds that were genetically modified to provide tolerance not only to glyphosate, but also to dicamba.

14. Monsanto also entered into agreements with competitors, including BASF and DuPont, to create, accelerate, and promote a dicamba-based crop system, with its own dicamba-resistant trait as the centerpiece.

15. After deregulation, Monsanto commercialized its new variety of dicamba-resistant soybean and cotton seeds under the trade-name "Roundup Ready 2 Xtend." Monsanto markets these seeds as genetically-modified to resist Dicamba. Thus, a farmer who plants dicamba-resistant seeds can theoretically spray his Roundup Ready 2 Xtend soybeans and cotton with dicamba and kill weeds, but not the dicamba-resistant crops.

16. The only benefit of Roundup Ready 2 Xtend soybean and cotton seeds over other alternatives is the seeds' resistance to dicamba. As one analyst, Jonas Oxgaard from the investment firm Bernstein, commented in the context of an EPA cut-off for spraying: "If the EPA imposed a April 15 [2018] cut-off date for dicamba spraying, that would be

catastrophic for Xtend – it invalidates the entire point of planting it." Tom Polansek and Emily Flitter, EPA eyes limits for agricultural chemical linked to crop damage, Reuters (Sept. 5, 2017) https://www.reuters.com/article/us-usa-pesticides-epa-exclusive/exclusive-epa-eyes-limits-for-agricultural-chemical-linked-to-crop-damage-idUSKCN1BG1GT ("Polansek and Flitter Article"). Simply put, Monsanto's Roundup Ready 2 Xtend seeds and dicamba herbicides (including Monsanto's dicamba herbicide, XtendiMax) were designed to go together, and make no sense as consumer-alternatives unless used in tandem.

17. By developing dicamba-resistant seeds, Monsanto knew its dicamba-based crop system would inevitably create widespread environmental hazards. Dicamba vaporizes quickly and is highly prone to drift. Thus, dicamba can cause devastating effects to surrounding non-resistant plants.

18. At least as early as 2010, Monsanto's own Dicamba advisory board warned that commercializing Xtend 2 soy and cotton would lead to the dicamba problems currently roiling farms and farming communities. Steve Smith, a former member of Monsanto's Dicamba advisory board testified before congress that "[t]he widespread use of dicamba is incompatible with Midwestern agriculture." *See* Danny Hakim, Monsanto's Weed Killer, Dicamba, Divides Farmers, (Sept. 21, 2017) N.Y. Times https://www.nytimes.com/2017/09/21/business/monsanto-dicamba-weed-killer.html ("Hakim Article").

19. Despite these warnings, Monsanto continued to develop its dicamba-based technology, including a supposedly less volatile version of dicamba under the trade name XtendiMax, to sell to farmers for use on Roundup Ready 2 Xtend soy and cotton.

20. Compounding the problems of off-target application or contamination, dicamba is not only volatile, it is prone to physical drift. Physical drift, as opposed to volatilization, is movement of spray to non-target areas. Such drift can be influenced by weather, wind speed and direction, droplet size, and ground speed or spray pressure. The new dicamba-based crop system, however, involves spraying this highly volatile, drift-prone, and damaging herbicide over the top of growing plants.

21. Monsanto, BASF, and DuPont know that dicamba is volatile and drift-prone, and has extreme negative effects on broad-leaf plants, including trees, fruits, vegetables, and various crops, especially soybeans. Monsanto's development of a trait genetically engineered to allow the plant to resist dicamba, and the spraying of dicamba over the top of crops after emergence from the ground, meant that dicamba would be sprayed much later in the year than before — in months that are hot and humid — near susceptible non-resistant crops also emerging and at high risk for damage by dicamba. *See* Hakim Article.

22. Monsanto, along with BASF and DuPont, each under agreement with Monsanto, proceeded to release and promote a dicamba-based crop system substantially certain to harm non-target crops and, as a result, pressure farmers to purchase Monsanto's dicamba-resistant trait.

8

23. Monsanto entered into agreements with BASF and Dupont to develop and market the dicamba-based crop system, consisting of the dicamba-resistant trait to be supplied by Monsanto, and in-crop dicamba herbicide to be supplied by both Dupont and BASF.

24. In a joint press release on November 2, 2010, Monsanto and BASF announced "significant progress toward launching next-generation dicamba-based weed control systems for soybeans and cotton." Joint Press Release, BASF and Monsanto Announce Progress in Dicamba Formulations (Nov. 2, 2010) https://monsanto.com/news-releases/basf-and-monsanto-announce-progress-m-dicamba-formulations/.

25. In joint press releases Monsanto and BASF stated that they had agreed to "collaborate on the advancement of dicamba tolerant cropping systems. The companies have granted reciprocal licenses and BASF has agreed to supply formulated dicamba herbicide products to Monsanto." *See* Joint Press Release, BASF and Monsanto Take Dicamba Tolerant Cropping System Collaboration to the Next Level (March 14, 2011) https://monsanto.com/news-releases/basf-and-monsanto-take-dicamba-tolerant-cropping-system-collaboration-to-the-next-level/.

26. On or around March 2013, Monsanto also reached a broad patent-licensing deal with DuPont, which included granting Dupont licensing rights to its dicamba-resistant technology in exchange for at least $1.75 billion. Brett Begemann, Monsanto president stated that the agreement "signals a new approach to our companies doing business together...." Andrew Pollack, Monsanto and DuPont Settle Fight Over Patent Licensing

(March 26, 2013), http://www.nytimes.com/2013/03/277business/monsanto-and-dupont-settle-fight-over-roundup-ready-technology.html.

27. Monsanto also entered into agreements with DuPont under which DuPont could utilize, market, and sell dicamba herbicide for in-crop use containing Monsanto's "VaporGrip Technology."

28. With these combinations and agreements in place, Monsanto, BASF, and DuPont aggressively marketed what the RR Xtend Crop System ("Xtend Crop System").

29. Monsanto's dicamba-resistant trait in soybean and cotton seed was deregulated by the USDA on or about January 14, 2015, meaning no further regulation by that agency and that Monsanto could commercialize soy and cotton seed containing that trait, if it so chose. Monsanto could also have chosen to entirely forego or at least delay the launch of dicamba-resistant technology given the warnings raised regarding dicamba, including by its own dicamba advisory board.

30. In its initial marketing, Monsanto represented it would delay commercializing its Roundup Ready Xtend Crop system (featuring dicamba herbicide and dicamba-resistant seeds) pending regulatory approvals. On March 1, 2012, Monsanto announced:

> Monsanto Company (NYSE: MON) today unveiled its new Roundup Ready® Xtend Crop System, which is designed to provide farmers with more consistent, flexible control of weeds, especially tough-to-manage and glyphosate-resistant weeds to maximize crop yield potential. **Pending regulatory approvals, this advanced system** is expected to be available to U.S. farmers for the 2014 growing season, consisting of an innovative new soybean trait solution and a next-generation herbicide formulation.

10

*See* New Roundup Ready Xtend Crop System to Extend Weed Control and Maximize Yield, (March 1, 2012) https://monsanto.com/news-releases/new-roundup-ready-xtend-crop-system-to-extend-weed-control-and-maximize-yield/ (emphasis added).

31. As reported in the New York Times in September 2017: "Because genetically modified crops allow dicamba to be sprayed later in the year, after crops emerge from the ground, and in hotter and more humid weather, the chemical is susceptible to what is known as "volatility" — it can turn into a gas and drift onto whatever happens to be nearby." In the same article, Scott Partridge, VP of Global Strategy for Monsanto touted its new low-volatility dicamba: "Those concerns [regarding drift and volatility] are what led to us developing the low-volatility formulation" of dicamba. *See* Hakim Article.

32. Given these known hazards, delaying release of its dicamba-resistant seeds until regulatory approval of a less volatile dicamba was the only reasonable and responsible choice for Monsanto. If dicamba-resistant products were released before EPA approval of over-the-top dicamba formulations, application of the then available dicamba formulations on Xtend crops would necessarily lead to non-target crop and plant damage. This is why, at least initially, Monsanto indicated it would withhold Xtend Crop System products from the market until over-the-top formulations were approved—to reduce the chance of non-target damage to crops and plants. Monsanto knew, and had in fact developed a new version of dicamba in parallel with its development of dicamba-resistant technology, that its dicamba-resistant seeds would be used with dicamba.

33. But rather than wait for EPA registrations for a less volatile dicamba, Monsanto commercialized Xtend 2 cotton for planting in 2015 and Xtend 2 soy for planting in 2016.

34. EPA registrations for the new dicamba formulations were not available until after harvest in 2016.

35. In 2015, when Monsanto received deregulated status from the USDA but before any "low"-volatility dicamba was available, Monsanto proceeded to commercialize (i.e. sell for widespread planting) its XtendFlex cotton.

36. As predicted, many farmers who purchased Monsanto's dicamba-resistant traits sought to take advantage of the sole benefit of XtendFlex cotton and sprayed their crops with high-volatility dicamba during the 2015 growing season.

37. In 2016, when there was still no low-volatility dicamba available, Monsanto commercialized RR2 Xtend soybeans for the 2016 growing season.

38. As predicted, many farmers who purchased Monsanto's dicamba-resistant traits took advantage of the sole feature of XtendFlex cotton and RR2 Xtend soybeans and sprayed their crops with dicamba during the 2016 growing season. *See* Hakim Article.

39. Monsanto's premature release of its seed-products designed to be used with dicamba and the inevitable use of dicamba started an uproar. Farmers and regulatory bodies immediately challenged Monsanto and BASF's release of its dicamba-resistant seeds and the resulting Dicamba drift. *See id.* State agricultural departments, including at least Missouri and Arkansas, were forced to issue temporary bans on dicamba. *Id.* The

EPA considered banning dicamba spraying at some point in the first half of 2018 to protect non-resistant crops and plants. Polansek and Flitter Article. Although the EPA eventually took a less restrictive position, the EPA's decision was immediately met with skepticism that its conditions would provide sufficient protection against dicamba drift. Dan Charles, <u>With OK from EPA, Use of Controversial Weedkiller is Expected to Double</u>, (Oct 13, 2017) https://www.npr.org/sections/thesalt/2017/10/13 /557607443/with-ok-from-epa-use-of-controversial-weedkiller-is-expected-to-double.

40. Dicamba volatility and drift generate and exacerbate the anticompetitive nature of Monsanto's conduct. Traditional dicamba drifts easily from farm-to-farm and is highly toxic. Because of how easily dicamba drifts, farmers are now forced to buy dicamba-resistant seeds or risk losing their crop. As one Arkansas farmer, Brent Henderson puts it: "If it's going to be legal to use and neighbors are planting it, I'm going to have to plant [dicamba-tolerant soybeans] to protect myself. It's very annoying. It's a property rights issue. My neighbor should not dictate what I do on my farm." *See id.*

41. Indeed, farmers now report that growing crops not genetically modified to resist dicamba is quickly becoming "impossible." *See* Hakim Article. Farmers must forego planting less expensive varieties because such varieties could be wiped out by dicamba drift. To avoid losing their crops, farmers are placed in an untenable position: plant less expensive GM or non-GM varieties and risk their crop being wiped out to by dicamba, or buy Monsanto's far more expensive Xtend 2 seeds. *See* Polansek and Flitter Article.

42. As one Missouri producer, Landon Hays put it: "[Monsanto] knew that people would buy [Xtend] just to protect themselves…. You're pretty well going to have to. It's a good marketing strategy, I guess. It kind of sucks for us." Jack Kaskey & Lydia Mulvany, Bloomberg, Creating a Problem — And a Lucrative Solution (Sept. 5, 2016).

43. Dicamba crop systems are responsible for tearing a huge rift in farming communities, pitting neighbor against neighbor, and in the worst-case scenario has even led to an alleged murder of a farmer who blew the whistle on dicamba spraying. The Pigweed Killer, Marianne McCune, (June 2, 2017) NPR Planet Money https://www.npr.org/sections/money/2017/06/02/531272125/episode-775-the-pigweed-killer.

44. Photos of the impact of dicamba drift reflect a surreal landscape where a dicamba-resistant field survives while a neighboring non-resistant field looks as if someone burned the non-resistant field to the ground. *See id.*

45. The University of Missouri found that dicamba volatility and drift damaged approximately 3.5% of U.S. plantings of soybeans, or 3.1 million acres in Summer 2017, despite the fact that Pioneer, BASF, and Monsanto's new, supposedly less-volatile, dicamba was available. *See* Polansek and Flitter Article. This number will undoubtedly grow as Xtend 2 seeds are even more widely commercialized this Spring.

46. Farmers' use of dicamba was foreseeable and in fact foreseen by Monsanto, BASF, and DuPont: the only reason for a producer to pay a premium to purchase dicamba-

resistant seeds is to take advantage of the seeds' supposed pesticide resistance. Otherwise the producer would opt for less expensive GM or GM-free options. And Monsanto in fact foresaw and knew that farmers would spray dicamba-resistant crops with dicamba.

47. Because of its market power and perverse incentives of its own making, Monsanto can and does charge a considerable premium for dicamba-resistant seeds. Dicamba-resistant soybeans can cost more than twice as much ($64 per bag) as Monsanto's Roundup ready (first generation) soybeans ($28 per bag), but the commercialization of dicamba-resistant seeds means farmers must now pay this premium to avoid their crops and businesses being wiped out. *See* Polansek and Flitter Article.

48. In Monsanto's October 7, 2015 Q4 conference call, Monsanto's President and COO Brett Begemann explained Monsanto's ability to charge a premium for Dicamba-resistant seeds over other second-generation Roundup varieties:

> We recently rolled pricing and are now planning for a launch that includes more than 70 unique soybean varieties across our branded and licensed footprint. Based on the value creation demonstrated, we have priced the new Xtend varieties at roughly $5 to $10 per acre premium over Roundup Ready 2 Yield varieties. This level of incremental value creation continues to reinforce Xtend as one of the leading core business growth drivers. Given the overwhelming demand from farmers, dealers and licensees, we've implemented a pre-order reservation process in advance of the final regulatory milestones and based on current tracking, we expect the seed to be fully reserved by early December.

Monsanto Company Q4 2015 Earnings Conference Call (October 7, 2015 9:30 AM ET), https://seekingalpha.com/article/3557566-monsantos-mon-ceo-hugh-grant-q4-2015-results-earnings-call-transcript?page=5.

49. Hence, by October 2015, Monsanto had dropped any pretense that it would delay launching Roundup Ready 2 Xtend soybeans, despite its earlier statements to the contrary.

50. On the same earnings call, Begemann outlined how dicamba crop systems would enhance Monsanto's market dominance:

> The other near-term blockbuster soybean technology is our Roundup Ready Xtend crop system, which will enhance the strength of our current Roundup Ready system with dicamba tolerance. We now see this as a 250 million acre opportunity across the Americas that extends beyond the soybeans and cotton to encompass corn given the progress we see in our pipeline. We expect this technology to ramp even faster than Intacta and our U.S. teams are gearing up for the largest technology launch ever, more than 3 million acres of Roundup Ready 2 Xtend soybeans in fiscal year 2016 as shown on Slide 15.

*See id.* Thus, Monsanto plans to extend its dicamba-resistant technology to yet another commodity crop: corn.

51. And because of the destruction and acrimony caused by dicamba volatility and drift, Monsanto's monopoly power continues to grow. As of September 2017, 25 million acres had been planted with Monsanto's dicamba-resistant seeds. The commercialization of Roundup Ready 2 Xtend is one of Monsanto's biggest product releases ever. Hakim Article. Unfazed by the lawsuits and regulatory concerns, Monsanto intends to commercialize even more aggressively in 2018, and double the scope of dicamba-resistant soybeans to 40 million acres in 2018. *Id.*

52. And while Pioneer, Monsanto, BASF, and Syngenta claim their new versions of dicamba may be safely applied over-the-top of crops after planting, mounting evidence indicates that supposedly less-volatile versions of dicamba have not solved dicamba volatility and drift.

53. Dr. Kevin Bradley from the University of Missouri stated: "I've been doing this for more than 20 years now and I was around when Roundup Ready was introduced.... In my opinion, this is nothing like the introduction of any trait or technology as far as the scope and the significance of the injury that's been observed across the U.S.... I just don't think we know enough yet to apply [dicamba] safely." Eli Chen, <u>As harvest season begins, farmers worry how dicamba herbicide could affect next year's crop</u> (Sept. 19, 2017), http://news.stlpublicradio.org/post/harvest-season-begins-farmers-worry-how-dicamba-herbicide-could-affect-next-year-s-crop#stream/0.

54. In late 2016 – after two full crop years of selling their dicamba-resistant seeds and creating a market filled with fear of dicamba volatility and drift, Monsanto and BASF received registrations from the EPA for their dicamba herbicides.

55. After receiving its registration, Monsanto began selling its dicamba formulation under the trade name XtendiMax with VaporGrip Technology ("XtendiMax"). BASF began selling its dicamba formulation under the trade name Engenia. Additionally, Dupont has come to market with its dicamba herbicide, FeXapan, and Syngenta is seeking approval of its own dicamba herbicide, Tavium.

## II. Monsanto's Market Power

56. Competition experts have recognized Monsanto's dominance in the transgenic seed market. As noted by the American Antitrust Institute in April 2010, "There are very few independent, rival transgenic seed platforms comprised of technologies other than Monsanto's. Inter-platform competition is thus limited, giving farmers few choices of traited seeds that do not include Monsanto technologies. Likewise, the ability of rivals to obtain access to Monsanto's traits to combine with their own technologies also appears limited because of potentially restrictive or selective licensing. This impedes intra-platform competition. A central issue, therefore, is the potential use of patent rights to improperly control or influence competition." Diana L. Moss, <u>Transgenic Seed Platforms: Competition Between a Rock and a Hard Place? (Addendum)</u> American Antitrust Institute,              (Apr.              5,              2010) https://www.antitrustinstitute.org/sites/default/files/Addendum%20to%20AAI%20White%20Paper_Transgenic%20Seed.4.5_040520101107.pdf.

57. Some reports peg Monsanto's market penetration in 2017 for dicamba-resistant U.S. soybeans at 20% and U.S. cotton at 50%. According to University of Wisconsin professor Kyle Stiegert: "Monsanto's approach to dicamba is part of a larger pattern of increasing dominance by a few players. 'Monsanto has been an aggressive business entity in dominating the seeds industry for some time now,' said Stiegert, who teaches agricultural and applied economics. 'I would see the dicamba situation as just another

step in that direction.'" *See* <u>Latest Monsanto GMO seeds raises worries of monopoly</u> (Dec. 14, 2017), www.dailymail.co.uk/wires/afp/article-5178029/Latest-Monsanto-GMO-seeds-raises-worries-monopoly.html.

58. In addition to seed sales, Monsanto exercises its dominant market power through licensing and cross-licensing deals with other biotech firms. These licensing deals proliferate the dicamba-resistant technology beyond Monsanto's sales because other biotech firms stack Monsanto and BASF's dicamba-resistant technology into their GM seeds.

59. According to a joint BASF-Monsanto press release in July 2016 regarding their multi-year dicamba supply agreement, Mike Frank, Monsanto vice president, said the agreement "represents continued commitment to the Roundup Ready® Xtend Crop System." Joint Press Release, Monsanto and DuPont Sign Dicamba Supply Agreement (July 7, 2016), http ://www.dupont.com/corporate-functions/media-center/press-rel eas es/mons anto-dupont-sign-dicamba-supply-agreement.html.

60. DuPont markets its "low" volatility dicamba herbicide under the trade name FeXapan. Dupont markets FeXapan as a low-volatility dicamba-formulation with "VaporGrip Technology" designed for use with dicamba-resistant traits sold only by Monsanto. DuPont promotes FeXapan as "part of the Roundup Ready 2Xtend® Acre Solution." <u>FeXapanTM Herbicide Plus Vaporgrip Technology</u>, http://www.dupont. com/products-and-services/crop-protection/soybean-protection/products/fexapan.html.

61. Monsanto bred the dicamba-resistant trait into its entire stock of soybeans. See Emily Flitter, Special Report: The decisions behind Monsanto's weed-killer crisis (Nov. 9, 2017), https://www.reuters.com/article/us-monsanto-dicamba-specialreport/special-report-the-decisions-behind-monsantos-weed-killer-crisis-idUSKBN1D91PZ.

62. In 2017, an estimated 22 million acres of soybeans, or roughly a quarter of all planted soybean acres, were dicamba-resistant. Eric Lipton, Crops in 25 States Damaged by Unintended Drift of Weed Killer, (Nov. 1, 2017) https://www.nytimes.com/2017/11/01/business/soybeans-pesticide.html?_r=0.

63. By 2019, Monsanto predicts U.S. farmers will plant Xtend 2 soybeans on 55 million acres or more than 60% of the soy acres planted in 2017. According to one analyst, this represents a $400-$800 million opportunity for Monsanto. See Polansek and Flitter Article.

64. Monsanto has entered into various agreements and combinations to ensure it can create and maintain its outsize market power. These combinations and agreements significantly diminish Monsanto's rivals' incentives to compete with Monsanto to offer meaningful dicamba-free growing options, because the other major biotech firms want to market and sale their own dicamba herbicide and dicamba-resistant seeds.

65. BASF, Monsanto's joint venture partner in the development of Roundup Ready 2 Xtend dicamba-resistant seeds, has a dicamba herbicide sold under the trade name Engenia. Engenia is marketed and designed for use with Monsanto's Xtend 2 seeds. BASF's label for Engenia provides that the herbicide is for "weed control in Dicamba-

tolerant (DT) cotton [and] Dicamba-tolerant soybean...." *See* http://www.cdms.net/ldat/ldDG8015.pdf.

66. DuPont, through its affiliate Pioneer Hi-Bred International ("Pioneer"), markets and sells its dicamba herbicide under the trade name FeXapan. According to Pioneer's website, FeXapan "is designed to work together with" with dicamba-resistant seeds, including Pioneer brand soybeans with Roundup Ready 2 Xtend technology. *See* <u>EPA Approval: FeXapan Dicamba Herbicide Plus VaporGrip Technology</u>, (Feb. 16, 2017) http://www.dupont.com/products-and-services/crop-protection/soybean-protection /press-releases/dicamba-herbicide.html.

67. Syngenta, another major biotech firm, has introduced its own dicamba-resistant soybean variety. *See* News Release, <u>Syngenta offers 12 new Roundup Ready 2 Xtend soybean technology varieties</u>, (Aug. 17, 2016) http://www.syngenta-us.com/newsroom/news_release_detail.aspx?id=200579. And Syngenta is currently seeking approval of its own dicamba-herbicide under the trade name Tavium, which it is marketing to use with Monsanto's dicamba-resistant seeds: Tavium "will be used on Roundup Ready 2 Xtend Soybeans or Bollgard II Xtend Flex Cotton." *See* http://www.syngenta-us.com/p/tavium/.

68. Monsanto's competitors have repeatedly recognized Monsanto's dominant position.

69. In July 2009, Pioneer counterclaimed against Monsanto in an intellectual property suit originally brought by Monsanto, alleging that Monsanto engaged in numerous anti-competitive acts to acquire, protect, and expand its monopoly power in the soybean and corn herbicide-tolerant markets. *See* Defendants' Amended Answer and Counterclaims ("Counterclaim"), *Monsanto Co. v. E.I. Dupont De Nemours and Co.*, No. 4:09-cv-00686, Doc. #24 at 28 (E.D. Mo. July 10, 2009). Pioneer alleged that Monsanto "is the dominant supplier of herbicide resistant soybean traits in the United States with a market share of approximately 99.7%" and has "virtually a complete monopoly" of this market, "including the power to control prices and exclude competition." *Id.*

70. Other sources have estimated Monsanto's market dominance in genetic traits to be, as of 2009, 97% for soybeans, 95% for cotton, and 75% for corn. *See* Diana L. Moss, Transgenic Seed Platforms: Competition Between a Rock and a Hard Place? American Anti-Trust Institute, 5 (Apr. 5, 2010). In her article, Moss, Vice-President and Senior fellow at the American Antitrust Institute at the time, notes that these figures came from Monsanto's own documents. According to Moss, Monsanto's shares "are—by any antitrust metric—market shares that would be considered monopolistic." *Id.*

71. In 2010, DuPont stated: "The ag biotech trait market is firmly in the grip of a single supplier, acting as a bottleneck to competition and choice." Comments of DuPont/Pioneer Regarding Agriculture and Antitrust Enforcement Issues in Our 21st Century Economy, https://www.justice.gov/atr/public/workshops/ag2010/016/AGW-15019-a.pdf.

72. As asserted by Pioneer, Monsanto uses stringent provisions in its licensing agreements to stifle competition, including requiring independent seed companies to switch to RR2 before the RR1 Patent expired thus suppressing competition on the original technology, preventing other companies from combining any non-Monsanto traits with Monsanto traits, and preventing independent seed companies from incorporating competing traits into their own breeding programs. *See* Counterclaim, at ¶¶ 64 *et seq*.

73. In 2009, Neil Hari, an agricultural economist at Iowa State University, opined that the extent of Monsanto's level of control of seed genetics "is almost unbelievable," and "[t]he upshot of that is that it's tightening Monsanto's control, and makes it possible for them to increase their prices long term. And we've seen this happening the last five years, and the end is not in sight." <u>AP: Monsanto Strong-Arms Seed Industry</u> (Dec. 14, 2009), https://www.cbsnews.com /news/ap-monsanto-strong-arms-seed-industry/.

74. Charles Benbrook, research professor at Washington State University's Center for Sustaining Agriculture and Natural Resources, estimated that from 2000 to 2010 – as genetically modified soybeans came to dominate the market – the price for seed increased 230 percent. The cost for Monsanto's RR2 soybeans in 2010 was $70 per bag, a 143 percent increase in the price of GE seed since 2001. Ken Roseboro, <u>The GMO Seed Monopoly: Fewer Choices, Higher Prices</u> (Oct. 4, 2013), http://www.fooddemocracynow.org/blog/2013/oct/4/the_gmoseedmonopolyfewerchoices_higher_prices.

75. The biotechnology industry is highly concentrated, with high barriers to entry.

76. It is expensive and time-consuming to bring a new GM seed variety to market. CropLife International estimates that it can take up to $135 million and 13.1 years, on average, to take a new variety from discovery to commercialization. CropLife International, Cost of Bringing a BioTech Crop to Market, https://croplife.org/plant-biotechnology/regulatory-2/cost-of-bringing-a-biotech-crop-to-market/.

77. In addition to these high entry barriers, the biotech seed industry has experienced (and is experiencing) rapid consolidation.

78. As reported before the Senate Judiciary Committee in 2016,

> Relative to other agricultural input sectors, the level of concentration and increases to concentration over time are the highest in crop seed. For example, the market share of the four largest firms, more than doubled to 54% between 1994 and 2009. In 2007, the four largest companies accounted for an estimated 72% of the U.S. market for corn seed and 55% of soybean seed, with Monsanto's share in corn and soybeans close to 65%. In 2009, the top four companies held 95% of the U.S. market for cottonseed, with Monsanto and Bayer accounting for the lion's share. In the traits market in 2009, the Big 6 [Monsanto, Syngenta, Bayer, DuPont, Dow, and BASF] held greater than 95% of trait acres for corn, soybeans and cotton in the U.S., with Monsanto alone accounting for 90% of these acres.

Testimony of Diana L. Moss, Ph.D., President, American Antitrust Institute, before The Senate Judiciary Committee "Consolidation and Competition in the U.S. Seed and Agrochemical Industry" at 4-5 (Sept. 20, 2016), https://www.judiciary.senate.gov/imo/media/doc/09-20-16%20Moss%20Testimony.pdf.

79. With recent acquisitions and potential acquisitions, including a proposal by Bayer to acquire Monsanto, and to spin off its LibertyLink (glufosinate tolerant) seed and herbicide business to BASF, this concentration will only grow tighter.

80. Producers who purchase seed containing Monsanto GM trait technology are direct purchasers of that technology.

81. As direct purchasers, these producers are harmed by being forced to pay supra-competitive, monopolistic prices for Monsanto's dicamba-resistance technology.

82. Monsanto requires all farmers who purchase seed containing its technology to sign a Monsanto Technology/Stewardship Agreement ("MTSA") and pay a fee for the technology. According to Monsanto policy, "seed containing Monsanto patented technologies can be sold only to growers who are properly licensed." Seed containing that technology, including the dicamba-resistant Xtend technology "can only be sold to growers who have a current, active, signed MTSA." Monsanto Seed Dealer Stewardship Policy, https://monsanto.com/app/uploads/2017/05/2016-trait-stewarship-policy.pdf.

83. The MTSA is a limited use license that allows growers to use Monsanto patented traits and germplasm. *Id.*

84. Monsanto requires that the grower sign the agreement and be licensed prior to delivery of the seed. *Id.*

85. Farmers must pay a technology fee to Monsanto for the genetically modified trait in addition to the price of base germplasm of the seed. Among other things, the 2017

MTSA provides that the farmer agrees "[t]o pay all applicable royalties and technology fees for the use of the Monsanto Technologies and applicable fees due Monsanto that are part of, associated with the Seed purchase price or that are invoiced for the Seed. If Grower fails to pay Monsanto or any wholly owned Monsanto subsidiaries, for costs of Seed, Monsanto Technologies, and/or royalties, Grower agrees to pay Monsanto default interest charges at the rate of 18% per annum (or the maximum allowed by law whichever is less) plus reasonable attorneys' fees, court costs and all other costs of collection." *See id.*

86. Concentrated markets are more prone and susceptible to the anticompetitive behavior alleged in this Complaint, a fact recognized by the USDA: "At low levels of concentration, when they face many competitors, firms have little control over pricing. If a single firm attempts to raise the price for its seeds or chemicals, farmers would be able to quickly switch to rival sellers, and the firm would lose so much business that the price increase would result in reduced revenues and profits. However, at higher levels of concentration, with only a few rivals in a market, farmers have fewer alternatives if a seller raised seed or chemical prices." James M. MacDonald, USDA Economic Research Service, Mergers and Competition in Seed and Agricultural Chemical Markets (Apr. 03, 2017), https://wwweers.usda.gov/amber-waves/2017/april/mergers-and-competition-in-seed-and-agricultural-chemical-markets/.

87. Already highly concentrated, the biotech industry is undergoing even greater consolidation. As the USDA recognized in 2015, the "Big Six" dominated private agricultural chemical seed research and production.

**The world's "Big Six" agricultural chemical companies**

| Company | Country | 2015 sales ($ millions) | | Proposed merger partner |
| --- | --- | --- | --- | --- |
| | | Seeds and biotech | Agricultural chemicals | |
| BASF | Germany | Small | 6,211 | None |
| Bayer | Germany | 819 | 9,548 | Monsanto |
| Dow Chemical | U.S. | 1,409 | 4,977 | DuPont |
| DuPont | U.S. | 6,785 | 3,013 | Dow Chemical |
| Monsanto | U.S. | 10,243 | 4,758 | Bayer |
| Syngenta | Switzerland | 2,838 | 10,005 | ChemChina |

Note: BASF does not separately report seed sales, placing them under an "other" category.
Source: USDA, Economic Research Service using data from Company Annual Reports.

*See id.*

88. With Dow and Dupont now combined, the "Big Six" is now a "Big Five", and as recognized by the USDA, once Monsanto and Bayer combine, the market will become dominated by four firms: Monsanto-Bayer, Dow-Dupont, Syngenta (now itself combined with Chem-China), and BASF. *See id.*

89. The number of soybean acres planted with Xtend technology rose from approximately 1 million acres in 2016 to more than 20 million acres in 2017. Monsanto projects that this will double to more than 40 million acres in 2018, and 55 million acres in 2019. Monsanto is targeting a penetration of more than 80 million soybean acres alone

in the U.S. *See* Monsanto Fourth-Quarter FY2017 Earnings Presentation "Fiscal Year 2017 Results and Outlook" (Oct. 4, 2017), https://monsanto .com/app/uplo ads/2017/10/Monsanto Co._Q4F17_Earnings_Presentation_2017.

90. In 2017, the USDA reported a "record level" of 89.5 million acres of soybeans planted in the United States, even though yield was down 6% from 2016. Thus, even at the 2017 record high, Monsanto's target is near 100% of the entire United States soybean market. And Monsanto has ensured that its market dominance will continue by engaging in elaborate combinations and agreements to sell dicamba crop systems. Monsanto now boasts it has licenses in place to sell its Xtend soybeans to seeds companies with more than 90% U.S. soybean seed share. *See id.*

91. Monsanto holds the patent on the dicamba-resistant technology with exclusive control over who can access the technology, pricing, marketing, and promotion, including the ability to place restrictions and requirements on any other companies who might want to use the technology. Given that farmers have and will continue to need dicamba-resistance technology to protect themselves against dicamba volatility and drift – an enormous problem created by the actions of Monsanto itself – Monsanto's market power is massive and will only continue to grow.

92. Monsanto's monopolization and attempted monopolization of the seeds market stymies competition, hurts producers, and harms the public at large. As the Associated Press has noted, "[d]eclining competition in the seed business could lead to price hikes

that ripple out to every family's dinner table. That's because the corn flakes you had for breakfast, soda you drank at lunch and beef stew you ate for dinner likely were produced from crops grown with Monsanto's patented genes." *See* Associated Press, <u>Monsanto Strong-Arms Seed Industry</u>, (Dec. 14, 2009).

93. The relevant geographic market is all areas in the U.S. where susceptible crops, including soybeans and cotton, are grown.

94. Before genetically-modified crops can be commercialized in the U.S. they must receive regulatory approvals from the USDA and EPA. The Food and Drug Administration also plays a role if the crop is intended for use in food. The process in the United States is long and costly. In response to increases in the price of traits sold in the U.S., U.S. farmers cannot turn to foreign suppliers of traits that have not already been approved in the U.S. Other factors, such as the U.S. distribution system and other demand characteristics, support the United States as the relevant geographic market.

### III. The Harm Caused by Defendant's Anti-Competitive Conduct Outweighs any Pro-Competitive Impact

95. Underscoring the recklessness of Monsanto's commercialization, the value provided to farmers by Roundup Xtend 2 has been called into question. In laboratory settings, it has been shown that Pigweed develops a resistance to dicamba very quickly, so dicamba is not likely to be a long-term solution to the Pigweed problem. A researcher at the University of Arkansas showed that Pigweed can develop a resistance to dicamba in as little as three generations. Thus, the supposed benefits of Xtend 2 seeds could

dissipate (or disappear) in three years or less. *See* Dan Charles, <u>How Monsanto and Scofflaw Farmers Hurt Soybeans in Arkansas</u>, (Aug. 1, 2006) https://www.npr.org/sections/thesalt/2016/08/01/487809643/crime-in-the-fields-how-monsanto-and-scofflaw-farmers-hurt-soybeans-in-arkansas.

96. Unfortunately, decreased efficacy of Xtend 2 does not necessarily mean decreased usage of dicamba technology, as Monsanto will almost certainly continue to market its dicamba system as effective, leading farmers to continue to buy Xtend 2 and spray dicamba. Indeed, biotech firms continue to market new herbicide- and pest-resistant GM varieties as ways to increase crop yield, despite reports that there is "little evidence" that the use of GM crops in the U.S. has led to yield gains. Danny Hakim, <u>Doubts About the Promised Bounty of Genetically Modified Crops</u>, N.Y. Times (Oct. 29, 2016) https://www.nytimes.com/2016/10/30/business/gmo-promise-falls-short.html.

97. While yield gained from GM seeds remains unclear, mounting data indicates that GM seeds are associated with a marked increase in the use of herbicides like dicamba. According to the New York Times, "[m]uch of the increase in herbicide use has come from Monsanto's first-generation Roundup, in which the active ingredient is Glyphosate." Monsanto thus knows from its experience with Roundup that herbicide-resistant seeds drive sales of herbicide. Karl Russell and Danny Hakim, <u>Broken Promises of Genetically Modified Crops</u>, N.Y. Times (Oct. 29, 2016) https://www.nytimes.com/interactive/2016/10/30/business/gmo-crops-pesticides.html.

98. Monsanto has publicly attempted to shift blame to growers by claiming that growers have failed to properly follow its complicated labeling instructions. *See, e.g.,* https://www.agweb.com/article/dicamba-lawsuits-mounting--naa-chris-bennett/. But Monsanto's labeling instructions are often inscrutable, containing pages of highly-detailed instructions, such as not to spray dicamba unless the wind speed is between 3-10 mph, not to spray between sunset and sunrise, using buffer zones, and not to apply dicamba during temperature inversions. Temperature inversions are defined nebulously in the label instructions, including the instruction that inversions "can be indicated by ground fog" or "[s]moke that layers and moves laterally in a concentrated cloud...." The inscrutability of such instructions indicate that supposed "low" – volatility dicamba remains volatile and prone to drift, a characteristic of the herbicide that will not be remedied by strict compliance with application instructions.

99. Dr. Rick Cartwright, a plant pathologist, University of Arkansas Extension administrator and Arkansas State Plant Board member, explained: "You apply (new dicamba formulations) to soybeans, and 36 hours later the product gets up and goes somewhere else. I don't know how you educate people to fix that." Greg D. Horstmeier, *Arkansas Sets Dicamba Limits* (Sept. 22, 2017), https://www.dtnpf.com/agriculture/web/ag/news/crops/article/2017/09/22/plant-board-limits-herbicide-use-2.

100. According to Dr. Bradley, all dicamba-based herbicides need to be kept "in the pre-plant, burndown, pre-emergence use pattern. Leave the post-emergence alone" and should not be used post-emergence, explaining that "the risk is too great for off-target movement" to be spraying it over the top of growing plants. David Bennett, What's the latest on dicamba drift in Missouri? (Sept. 1, 2017), http://www.deltafampress.com/soybeans/what-s-latest-dicamba-drift-missouri.

101. Plaintiff and the class are direct purchasers of Monsanto's dicamba-resistant traits. Plaintiff and the class have been harmed by the anticompetitive conduct of Monsanto, either acting alone, and/or in concert with co-conspirators as described herein.

## CLASS ALLEGATIONS

102. Plaintiff brings this case on behalf of a Rule 23(b)(1) and Rule 23(b)(3) class.

103. Plaintiff brings this case on behalf of a class defined as: all individuals and entities who directly purchased seeds containing Monsanto's dicamba-resistant trait (the "Class"). Monsanto and its subsidiaries, employees, officers, agents; and the Court, the Court's relatives, and Court personnel are excluded from the Class.

104. Plaintiff reserves the right to amend the foregoing class definition or to define subclasses before this Court determines whether certification is appropriate.

105. **Numerosity.** The class is so numerous that joinder of all Class members is impracticable because there are tens of thousands of class members geographically dispersed across the country. Plaintiff believes that Monsanto's records, including but

not limited to Monsanto's MTSA records, maintained in the ordinary course, will reveal the exact number of Class members, and provide the identities of Class members.

106. **Commonality.** This action presents material questions of law common to the class. Without limitation, these common questions include:

a. Whether Monsanto has engaged and/or continues to engage in unlawful combinations, conspiracies, or contracts in restraint of trade;

b. Whether Monsanto acted irresponsibly, recklessly, and/or deliberately when it commercialized its dicamba-resistant seeds;

c. Whether Monsanto's actions are a monopolization of the soy and cotton seeds market;

d. Whether Monsanto's actions are an attempt to monopolize the soy and cotton seeds market;

e. The nature of Monsanto's market power in the relevant market and whether such power is a monopoly or attempted monopoly;

f. Whether Monsanto acquired its market power through anticompetitive conduct;

g. Whether Monsanto's conduct in attaining or attempting to attain a monopoly was anti-competitive;

h. Whether Monsanto's agreements, combinations, and contracts relating to dicamba and dicamba-resistance constitute an unreasonable restraint of trade under the Sherman Act;

i. Whether Monsanto entered into one or more contracts, combinations, or conspiracies regarding research, development, and promotion of a dicamba-based crop system with the intent and having the effect of damaging non-resistant crops and pressuring farmers into buying dicamba-resistant seeds;

j. Monsanto and its co-conspirators knowledge regarding whether their acts and omissions would cause or contribute to dicamba volatility and drift;

k. Whether Plaintiff and class members have been damaged in their business or property because of one or more antitrust violations.

107. **Typicality.** Plaintiff's claims are typical of the Class's claims. Plaintiff used the same or similar MTSA and licensing agreement with Monsanto as other class members. Like other class members, Plaintiff directly purchased dicamba-resistant seeds.

108. **Adequacy.** Plaintiff and counsel are adequate to represent the class. Plaintiff has retained counsel with extensive experience in complicated class litigation.

109. This case presents common questions requiring class treatment to avoid the risk of inconsistent or varying adjudications that could create incompatible standards for Defendant.

110. **Predominance.** Common questions predominate over any individual questions. Monsanto's conduct, combinations, agreements and conspiracies will all be discovered without the need for participation by individual class members.

111. **Superiority.** A class action is superior to all other methods of adjudicating this controversy. A class action will allow numerous similarly-situated persons to prosecute their respective class claims in a single forum efficiently and without unnecessary duplication. There will most likely be insufficient incentives for dicamba-resistant technology purchasers to pursue individual actions as their potential recovery will be small relative to the time and expense associated with prosecuting an individual action against a major corporation like Monsanto. Absent class treatment, many putative Class members will continue to suffer the injuries described here without a remedy. Even if separate cases could be brought, the resulting multiplicity of litigation would cause undue hardship and expense for the parties and the courts, as well as create a risk of inconsistent rulings and adjudications that, as practical matter, would be dispositive of the other class members not parties to individual adjudications, or would substantially impair or impede their ability to protect their interests.

112. This case is manageable as a class action and a class trial will be manageable. Notice may be provided to members of the Class by first-class mail. Class members' claims will be decided under federal substantive law, thus the Court will not have apply the law of multiple jurisdictions.

113. To the extent not all issues or claims, including damages, can be resolved on a class-wide basis, Plaintiff invokes Rule 23(c)(4) and reserves the right to seek certification of narrower and/or re-defined classes and/or to seek certification of a liability class or certification of certain issues common to the class. To the extent necessary for Rule 23(c)(4) certification, Rules 23(a) and 23(b) are satisfied. And resolution of particular common issues would materially advance the disposition of the litigation as a whole.

**CLAIMS FOR RELIEF**

**Count I: Unreasonable Combination, Agreement,
Contract in Restraint of Trade
Sherman Act § 1**

114. Plaintiff incorporates all previous paragraphs here.

115. In combining, conspiring, and/or contracting with its competitors to market dicamba resistant seeds, Monsanto unreasonably restrained trade in interstate commerce.

116. Monsanto, BASF, and DuPont colluded with the unlawful objective to create the anticompetitive conditions alleged in this Complaint. Such anticompetitive conduct includes, without limitation, the companies' design and marketing of a product for use with dicamba, and these companies' commercialization of dicamba-resistant technology before supposedly low-volatility dicamba was available.

117. BASF and DuPont benefit from their agreement, combination or conspiracy with Monsanto. Sales of Monsanto's dicamba-resistant trait benefit BASF's sales of Engenia; DuPont, which until 2013 was competing and attempting to compete with Monsanto and

claiming anti-trust violations vis-a-vis access to Monsanto's herbicide resistance technology, has, among other things, gained access to Monsanto's herbicide resistant technology, including Roundup Ready 2 and dicamba-resistance, which it now uses in its own branded seed. It also benefits through sales of its FeXapan herbicide with Monsanto's "VaporGrip" technology.

118. These companies' concerted action was intended to and does unreasonably restrain trade or interstate commerce.

119. A farmer's access to dicamba-resistance requires purchase of seed containing that trait, whether he is interested in the germplasm or other traits that might be stacked in that seed and regardless of the higher price.

120. Monsanto has dominant market power in herbicide-resistant traits, and as patent-holder, is the only developer with power over who has access to its dicamba-resistant trait, as well as the terms of its use. Monsanto has power to raise prices significantly above competitive level and also to exclude competition.

121. Moreover, Monsanto's conduct, together with BASF and DuPont, has produced and will continue to produce unlawful adverse effects on competition, including injury to competing crops grown with non-dicamba resistant seed, discouraging farmers from purchasing competing non-resistant seed, suppressing competition, and depriving farmers of choice in what they purchase, as well as cause artificially high prices for seed containing the dicamba-resistant trait.

122.  As a direct and proximate result of Monsanto's conduct in violation of Section 1 of the Sherman Act, Plaintiff and the Class have been and will continue to be damaged, in amounts to be proven at trial.

123. Plaintiff and the Class are entitled to treble the damages sustained, together with the cost of suit and reasonable attorneys' fee pursuant to 15 U.S.C. § 15.

## Count II: Monopoly
### Sherman Act § 2

124. Plaintiff incorporates all previous paragraphs here.

125. Monsanto possesses monopoly power in the relevant market of genetically-engineered herbicide resistance, including resistance to dicamba.

126. Monsanto has used its monopoly power to foreclose competition, gain a competitive advantage, and/or destroy competition.

127. In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Monsanto has willfully and unlawfully acquired, maintained and exercised this monopoly power by coercive, exclusionary and anticompetitive conduct as alleged herein, including development and promotion of a crop system virtually certain to harm competitor crops that are susceptible and not resistant to dicamba, enhancing Monsanto's long term ability to suppress or foreclose competition, artificially increase demand, and reap the benefits of its monopoly power.

128. Such behavior is without legitimate business purpose and makes sense only because it suppresses and eliminates competition.

129. Because of its willful and unlawful monopolistic conduct, Monsanto has maintained its monopoly or market power in the relevant market in which competition has been unlawfully reduced, eliminated or foreclosed.

130. As a direct and proximate result of Monsanto's conduct in violation of Section 2 of the Sherman Act, Plaintiff and the Class have been and will continue to be damaged, in amounts to be proven at trial.

131. Plaintiff and the Class are entitled to treble the damages sustained, together with the cost of suit and reasonable attorneys' fee pursuant to 15 U.S.C. § 15.

## Count III: Attempt to Monopolize
### Sherman Act § 2

132. Plaintiff incorporates all previous paragraphs here.

133. Monsanto has and continues to willfully engage in anticompetitive conduct as alleged herein, including promotion of a crop system that places competing non-resistant crops at great risk and improperly steers purchasers to its dicamba-resistant trait out of fear, to obtain a monopoly in the market for herbicide-resistant traits in all crops susceptible to dicamba, including cotton and soybeans.

134. There is a dangerous probability of Monsanto's success, as demonstrated by Monsanto's own projections of Xtend sales.

135. Monsanto has acted with the specific intent to monopolize, to control prices and/or suppress and destroy competition in the relevant market.

136. As a direct and proximate result of Monsanto's conduct in violation of Section 2 of the Sherman Act, Plaintiff and the Class have been and will continue to be damaged, in amounts to be proven at trial.

### Count IV: Combination, Contract, or Conspiracy to Monopolize
### Sherman Act § 2

137. Plaintiff incorporates all previous paragraphs here.

138. Monsanto, by its agreements and collaborations with BASF and DuPont, has engaged in a combination or conspiracy to monopolize and continue its monopolization of herbicide-resistant traits in the relevant geographic market.

139. Monsanto has engaged in numerous overt acts in furtherance thereof.

140. Monsanto acted with specific intent to monopolize as expressed through its actions to destroy competition and build monopoly.

141. Monsanto's co-conspirators BASF and DuPont shared Monsanto's specific intent to monopolize the market with dicamba-resistant trait. Each benefits from such a monopoly as alleged herein.

142. As a direct and proximate result of Monsanto's conduct in violation of Section 2 of the Sherman Act, Plaintiff and the Class have been and will continue to be damaged, in amounts to be proven at trial.

143. Plaintiff and the Class are entitled to treble the damages sustained, together with the cost of suit and reasonable attorneys' fee pursuant to 15 U.S.C. § 15.

**PRAYER FOR RELIEF**

144. Plaintiff, on behalf of itself and the Class, respectfully requests:

    a.   Trial by jury on all issues so triable;

    b.   Certification of this action as a class action, including appointing Plaintiff as class representative and undersigned counsel as class counsel;

    c.   Judgment in favor of Plaintiff and the Class and against Defendant in an amount that is fair and reasonable as determined by the jury trial;

    e.   Pre-judgment interest at the maximum rate permitted by the law;

    f.   All costs incurred in connection with this action;

    g.   Reasonable attorneys' fees; and

    h.   Such other and further relief, at law or in equity, as this Court deems just and proper.

Dated: February 1, 2018                    Respectfully submitted,

**WEINHAUS & POTASHNICK**                 Richard M. Paul III (Mo. Bar 44233)

                                           Ashlea Schwarz (Mo. Bar 60102)

*/s/ Mark A. Potashnick*                   Sean Cooper (Mo. Bar 65847)

Mark A. Potashnick (MO Bar # 41315)        **PAUL LLP**

11500 Olive Boulevard, Suite 133           601 Walnut Street, Suite 300

St. Louis, Missouri 63141                  Kansas City, Missouri 64106

P: (314) 997-9150                          P: (816) 984-8103

Facsimile: (314) 997-9170                  F: (816) 984-8101

markp@wp-attorneys.com                     Rick@PaulLLP.com

                                           Ashlea@PaulLLP.com

                                           Sean@PaulLLP.com


Kenneth A. Wexler                          Daniel E. Gustafson (Mn. No. 0202241)

Justin N. Boley                            Amanda M. Williams (Mn. No. 0341691)

Tyler J. Story                             Eric S. Taubel (Mn. No. 0392491)

WEXLER WALLACE LLP                         **GUSTAFSON GLUEK PLLC**

55 W. Monroe Street, Suite 3300            Canadian Pacific Plaza - Suite 2600

Chicago, Illinois 60603                    120 South 6th Street

T: (312) 346-2222                          Minneapolis, Minnesota 55402

kaw@wexlerwallace.com                      P: (612) 333-8844

jnb@wexlerwallace.com                      F: (612) 339-6622

tjs@wexlerwallace.com                      dgustafson@gustafsongluek.com

                                           awilliams@gustafsongluek.com

                                           etaubel@gustafsongluek.com


**ATTORNEYS FOR PLAINTIFFS**